UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

SUSIE C. CROSS,                        )
                                       )
                Plaintiff,             )
                                       )
        v.                             )    No.  1:05CV113 ERW
                                       )                  (FRB)
JO ANNE B. BARNHART,                   )
Commissioner of Social Security,       )
                                       )
                Defendant.             )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse
determination by the Social Security Administration.  All pretrial
matters were referred to the undersigned United States Magistrate
Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural History**

On April 15, 2003, plaintiff Susie C. Cross filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an
application for Supplemental Security Income pursuant to Title XVI
of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which
she claimed she became disabled on December 15, 2002.  (Tr. 105-
07.)  On initial consideration, the Social Security Administration
denied Plaintiff's claims for benefits.  (Tr. 63-66, 77, 96-99.)
On August 4, 2004, a hearing was held before an Administrative Law
Judge (ALJ).  Plaintiff testified and was represented by counsel.

A vocational expert also testified at the hearing. (Tr. 22-54.) On December 20, 2004, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 10-21.) On May 20, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 2-4.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on August 4, 2004, Plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff is fifty-one years of age. (Tr. 28.) Plaintiff stands five-feet, three-inches tall and weighs 160 pounds. (Tr. 45.) Plaintiff completed the ninth grade in high school. (Tr. 28.) Plaintiff never obtained a GED nor received any vocational training. (Tr. 45.) Plaintiff lives with her husband and has no minor children at home. (Tr. 28.)

In 1987, Plaintiff worked as a machine operator in a shoe factory. From 1988 to 1992, Plaintiff worked as a cook in a restaurant. From March 1989 to August 1990, and from April to November 1992, Plaintiff worked as a machine operator in a clothing factory and a hat factory, respectively. From May 1993 to January 1999, Plaintiff worked in a chicken processing plant. (Tr. 141-46.) Plaintiff testified that she last worked in April 2003 assisting the elderly in home health care. (Tr. 28.) Plaintiff

testified that she performed such work for three years but determined to quit the job due to her concern that the pain she experienced and the cramping in her feet would cause her to experience an accident which could harm other people.  (Tr. 29.) Plaintiff testified that she could not return to factory work because of the stress and heavy lifting involved.  (Tr. 32.)

Plaintiff testified that nerve problems in her lower back cause her to experience pain that radiates down her leg.  Plaintiff testified that it sometimes feels as though a knife has been shoved through her back, depending upon how she bends or picks up things. (Tr. 33.)  Plaintiff testified that she is able to relieve the pain somewhat if she sits or kneels for a minute.  Plaintiff testified that she experiences a dull pain in her back constantly, but that she experiences sharp pain with bending, lifting and "doing a lot of hard work[.]"  (Tr. 33-34.)  Plaintiff testified that she received no treatment for her back condition until April 2004. (Tr. 44.)  Plaintiff testified that she has since received epidural injections which have provided limited relief.  (Tr. 36-37.)

Plaintiff testified that she recently underwent surgery on her left foot to correct the direction of a toe which was drawing up under her foot, causing her pain and difficulty with walking.  (Tr. 35.)  Plaintiff testified that she had similar surgery on another toe approximately four years prior.  (Tr. 36.)

Plaintiff also testified that activity with her hands

causes them to swell and become numb and painful. (Tr. 32-33.) Plaintiff testified that she feels as though a nerve has been cut and she drops things. Plaintiff testified that she does not experience such sensations when she is not active with her hands. (Tr. 33.)

Plaintiff testified that weather aggravates her physical conditions, causing difficulty with breathing, worsening pain and extensive aching during cold weather. (Tr. 39.)

Plaintiff also testified that she was currently undergoing counseling for depression. (Tr. 40-41.) Plaintiff testified that she has no desire to engage in any activities, but that she does not have any problem being around people. Plaintiff testified that she takes Lexapro for the condition, but that she must take the medication in the morning because it keeps her awake. (Tr. 41.)

Plaintiff testified that she cleans her own house to the extent she is able, and that prior to her recent surgery she could vacuum for fifteen minutes before having to sit for thirty minutes to rest and relieve her pain. (Tr. 34, 39.) Plaintiff testified that she does laundry and, with her daughter's assistance, goes grocery shopping once a month. (Tr. 34, 47-48.) Plaintiff testified that she visits no one and receives no visitors. (Tr. 41.) Plaintiff testified that she belongs to no social clubs but that prior to surgery, she attended church three times a week.

Plaintiff testified that she went to church the previous Sunday, which was the first time in three weeks. Plaintiff testified that the church services are nearly three hours in length, but that she gets up, walks around, and squirms while she sits during the services. (Tr. 40.)

Plaintiff testified that she experiences pain when she walks, but estimated that she could walk an average of one block. (Tr. 34.) Plaintiff testified that she has walked with the assistance of a walker during the previous three weeks. (Tr. 35.) Plaintiff testified that she has difficulty with stairs. (Tr. 47.) Plaintiff testified that she could lift approximately ten pounds without causing problems with her back. (Tr. 34.) Plaintiff testified that she can sit for approximately thirty minutes. (Tr. 47.) Plaintiff testified that she was currently unable to stand, but that prior to her foot surgery, she could stand for up to ten or fifteen minutes before she would have to sit due to pain in her back and feet. (Tr. 37, 46.) Plaintiff also testified that she was able to drive prior to her foot surgery. Plaintiff testified that she sometimes drove sixty miles to her doctor's appointments but would stop every twenty miles so that she could get out and walk around. (Tr. 42-43.) Plaintiff testified that she began making such stops during the previous year due to the pain in her lower back, difficulty using her left leg, and numbness in her left foot. (Tr. 43-44.)

B.    Testimony of Vocational Expert

        Dr. John Grenfell, a vocational expert, testified at the

hearing in response to questions posed by the ALJ and counsel.  The

ALJ first asked Dr. Grenfell to consider a hypothetical individual

            with the Claimant's age, education, training,
            past relevant work experience, if the
            individual were limited to light levels of
            lifting and carrying, if the individual were
            limited to standing no longer than 45 minutes
            at one time, were limited to sitting no more
            than 30 minutes at one time, with the need for
            an alternate sit/stand option, with no walking
            of no more than two or three blocks at one
            time, not working in temperature extremes, hot
            or cold[.]

(Tr. 49.)


Dr.  Grenfell  testified  that  such  a  person  could  not  perform

Plaintiff's  past  relevant  work.    (Tr.  49-50.)    Dr.  Grenfell

testified  that  such  a  person  could  perform  other  work,  however,

such  as  surveillance  systems  monitor,  of  which  110,000  such  jobs

exist  in  the  national  economy  and  2,500  in  the  State  of  Missouri;

production  inspector,  of  which  40,000  such  jobs  exist  in  the

national  economy  and  800  in  the  State  of  Missouri;  and  auto  clerk,

of  which  80,000  such  jobs  exist  in  the  national  economy  and  1,200

in  the  State  of  Missouri.    Dr.  Grenfell  testified  that  such  jobs

were  sedentary  and  unskilled  and  essentially  involved  minimal

lifting.    (Tr.  50-51.)    Dr.  Grenfell  also  testified  that  such  a

person  could  perform  work  at  the  light  exertional  level  such  as

photo or copy machine operator, of which 20,000 such jobs exist in the national economy and 1,100 in the State of Missouri; light production inspection jobs, of which 200,000 exist in the national economy and 1,500 in the State of Missouri; and cashier, of which 1,600,000 such jobs exist in the national economy and 60,000 in the State of Missouri. (Tr. 51-52.)

The ALJ then asked Dr. Grenfell to assume all of Plaintiff's complaints to be credible. Dr. Grenfell testified that such a person would be prevented from engaging in any sustained work activity, given "her inability to stand or sit for any prolonged periods, to be unable to walk, to have to lie down, the level of pain that she complains about, [and] the affects [sic] of the medication on her[.]" (Tr. 52.)

### III. Medical Records

On September 15, 2000, Plaintiff visited Cross Trails Medical Center for physical examination and complained of a possible spider bite. (Tr. 244-48, 273-75.) Plaintiff also reported that she had experienced joint pain and arthritis, back problems at times, and swelling of the ankles. (Tr. 275.) Plaintiff reported that she currently took no medications. (Tr. 273.) Plaintiff requested that her left foot be examined as well inasmuch as she had recently undergone corrective surgery for hammertoe. Dr. Reno R. Cova, Jr., noted that an overlap of the second and third toe was developing. Dr. Cova recommended that

Plaintiff tape her toes to prevent further overlap.  (Tr. 244.)

On November 16, 2000, Plaintiff returned to Cross Trails and complained to Dr. Cova of mild upper respiratory drainage which she reported to probably be related to her exposure to smokey environments.  Dr. Cova diagnosed Plaintiff with shortness of breath associated with allergens and Plaintiff was administered a pneumonia shot.  (Tr. 238.)

Plaintiff visited Cross Trails on August 15, 2001, and complained of experiencing cold symptoms with headaches.  Plaintiff was diagnosed with bronchitis and medication was prescribed.  (Tr. 236.)  Plaintiff's symptoms improved after one week.  (Tr. 235.)

On July 16, 2002, Plaintiff returned to Cross Trails and complained of pain in her right arm and side, and in her left leg. Plaintiff reported that taking aspirin and Tylenol provided no relief.  Physical examination showed minor pain with range of motion of the upper and lower extremities.  Plaintiff was prescribed Bextra[1] and was instructed to return as needed.  (Tr. 234.)

Plaintiff visited Cross Trails on March 18, 2003, and reported that she injured her right wrist while working with a tiller, and specifically, that the cord pulled back and struck her

---

[1]Bextra is a non-steroidal anti-inflammatory drug (NSAID) used to relieve some symptoms caused by arthritis, such as inflammation, swelling, stiffness, and joint pain.  Medline Plus (revised Apr. 8, 2005)<http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a602011.html>.

across the radius and ulna. Physical examination showed tenderness across the right radial head and ulna head with decreased range of motion with pronation and supination. An x-ray showed no fracture and a wrist splint was applied. (Tr. 231.) On March 20, 2003, Plaintiff returned to Cross Trails and reported that her wrist was feeling a little better. Plaintiff's range of motion was noted to be improving. Another x-ray of the wrist continued to show no fracture. Plaintiff was instructed to perform wrist exercises. (Tr. 230, 272.)

On April 2, 2003, Plaintiff complained to Cross Trails that she was experiencing pain in her hand, feet and between her shoulders. It was noted that the alignment of Plaintiff's toes was changing. It was also noted that Plaintiff was "considering disability." Physical examination showed Plaintiff's second toe on her left foot to be covered by the third toe. Plaintiff was diagnosed with joint pains, fatigue and hammertoes. Plaintiff was instructed to undergo a lab panel and was referred to the foot clinic. (Tr. 229, 271.)

Plaintiff visited the Cross Trails Foot Clinic on April 7, 2003. Plaintiff was diagnosed with hammertoe deformity with pain. Orthotics were recommended but Plaintiff reported that she could not afford them. It was determined that a shoe insert adaptation with padding and a toe separator would be tried. Plaintiff was instructed to follow up in two months. (Tr. 268.)

On April 24, 2003, Plaintiff visited Cross Trails for "disability determination." (Tr. 229.) Plaintiff reported that she could not drive long distances due to the coordination required for the clutch and brake; that she experiences diffuse joint and muscle pain when she lifts heavy items, tills the garden, etc.; and that she was seeking disability and Medicaid assistance. Plaintiff also complained that she was experiencing urinary incontinence. Neurological examination showed no deficits. Musculoskeletal examination showed no focal deformity. Mental status examination was noted to be appropriate. Plaintiff was given samples of Ditropan for incontinence and was instructed to return in two weeks. (Tr. 228.)

On May 8, 2003, Plaintiff reported to Cross Trails that her incontinence was a little better with medication. Plaintiff was instructed to continue with her medication. Plaintiff also continued to complain of diffuse joint pain and reported the pain to worsen with weather changes. Plaintiff was advised to use NSAIDS and was instructed to return in one month. (Tr. 227.)

On June 6, 2003, Plaintiff underwent a consultative physical examination for Disability Determinations. (Tr. 261-66.) Dr. Chul Kim noted Plaintiff's chief complaints to be problems with her foot, hand and lungs. With respect to her foot problem, Plaintiff reported to Dr. Kim that she had developed a hammertoe on the left foot approximately five years prior and, after two years,

underwent surgery to correct the problem. Plaintiff reported that she developed another hammertoe on the left foot approximately two years prior which currently caused pain. Plaintiff reported that pain develops in the toe and shoots up to the left hip if she stands for about an hour or walks for about a block. With respect to her hand problem, Plaintiff reported that she has experienced pain, swelling, stiffness, and poor grip for about a year. Plaintiff reported that she had previously received a diagnosis of arthritis and that Advil provides some benefit. With respect to her lung problem, Plaintiff reported to Dr. Kim that she had smoked cigarettes for approximately fifteen years but had quit six years prior. Plaintiff reported that during the previous year, she had experienced dyspnea with hot or humid weather, overexertion, or while walking too far or too fast. (Tr. 261.) Plaintiff reported that her chest feels tight and painful with dyspnea. (Tr. 262.) Plaintiff reported that she also experiences occasional wheezing and a productive cough. (Tr. 261.) Plaintiff reported that she obtains benefit with the use of an inhaler. Plaintiff reported that she has had no emergency room visits, but that she received outpatient treatment on one occasion when she "almost had pneumonia." Plaintiff also reported that she sometimes experiences headaches and dizziness, and that she sometimes has pain in her abdomen, lower back and shoulders. (Tr. 262.) Physical examination showed Plaintiff to be in no acute distress. Dr. Kim

noted Plaintiff's mental state to be clear and that Plaintiff had a good memory and was cooperative. Dr. Kim noted Plaintiff to have limited range of motion with pain about the right shoulder. Dr. Kim noted the remainder of the major joints to be nonspecific. Flexion of the lumbar spine was ninety degrees with lower back pain, and the lower back over the lumbar spine was tender without muscle spasm. Straight leg raising was limited bilaterally to sixty degrees with lower back pain. (Tr. 263-64, 265-66.) Dr. Kim noted Plaintiff's gait to be stable and that she could walk on her heels and toes. Plaintiff was able to bear full weight on her right and left leg, was able to get on and off the examination table, and could squat without significant problem. (Tr. 264.) Plaintiff's right hand grip measured at 4/5 and Dr. Kim noted Plaintiff's right arm to be somewhat weaker than the left. (Tr. 264, 265.) No edema was noted in the legs. Neurological examination was nonspecific. Dr. Kim's impression was that Plaintiff had recurring hammertoe on the left foot which causes much pain when Plaintiff is on her feet, with radiation to the left hip; trouble with arthritis in both hands; and chronic obstructive lung disease. (Tr. 264.)

On June 9, 2003, Plaintiff reported to Cross Trails that she continued to experience slight incontinence with sneezing or coughing. Plaintiff was instructed to increase Ditropan. Plaintiff also complained of back pain and reported that she had to

lift her husband the previous week. Physical examination showed mild tenderness over the paraspinals. Plaintiff was advised to use Advil and was instructed to use proper lifting techniques. (Tr. 226.)

Plaintiff returned to Dr. Kim on June 24, 2003, to undergo a consultative bronchospasm evaluation for Disability Determinations. (Tr. 249-60.) The results of the pulmonary function study were normal. (Tr. 249-50.)

On August 8, 2003, Plaintiff reported to Cross Trails that she continued to have sporadic back pain and that such pain worsened with bending and lifting. It was noted that Advil helped the pain. Mild tenderness was noted along the lower back with range of motion. Plaintiff's incontinence was noted to be stable as was Plaintiff's low back pain. Plaintiff was instructed to continue with Ditropan and with Advil as needed. (Tr. 225.)

On October 28, 2003, Plaintiff returned to Cross Trails for follow up of pain in her shoulders, arm, hand, back, hips, knee, legs, ankles, and feet. (Tr. 221-22.) It was noted that Plaintiff's pain was diffuse, chronic and arthralgic. Plaintiff reported the pain to be mild and that it interfered with her sleep and household activities. Physical examination showed normal range of motion and Plaintiff was noted to have normal gait and weight bearing abilities. (Tr. 221.) Plaintiff's mood and affect were noted to be normal. Plaintiff was diagnosed with arthralgia and

Bextra samples were given.  Plaintiff was instructed to return for follow up in two weeks.  (Tr. 222.)

On November 11, 2003, Plaintiff reported to Cross Trails that the pain in her hands improved with Bextra but that her back pain had not improved.  (Tr. 219.)  Plaintiff described her pain as moderate.  It was noted that Plaintiff was out of Bextra, but Plaintiff reported that she could not afford any medications because she had no job and no insurance.  Physical examination showed mild hand swelling and mild tenderness along the lumbo/ sacral spine.  (Tr. 219-20.)  Straight leg raising was negative bilaterally.  Plaintiff was diagnosed with arthralgia and was advised to take Advil.  Plaintiff was instructed to return as needed.  (Tr. 220.)

On December 31, 2003, Plaintiff returned to Cross Trails and complained of having heartburn for three weeks.  (Tr. 215-16.) It was noted that a lengthy discussion was had with Plaintiff regarding family and marital stressors.  It was also noted that Plaintiff had financial stress and had constant worry, depression, lack of interest in things, and feelings of hopelessness and helplessness.  Zoloft[2] was prescribed.  Plaintiff was diagnosed with situational depression and gastroesophageal reflux disease (GERD).  (Tr. 216.)

Plaintiff returned to Cross Trails on January 14, 2004,

_____

[2]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

and reported that she had not taken any medication since her last visit.  (Tr. 213.)  Plaintiff was given samples of Lexapro[3] and Nexium[4] and was instructed to return in two weeks.  (Tr. 214.)

On January 28, 2004, Plaintiff reported to Cross Trails that her depression was improving with Lexapro.  (Tr. 211.) Diagnoses of GERD and depression were continued and Plaintiff was instructed to continue with her medication.  (Tr. 212.)

During Plaintiff's well-woman examination on February 26, 2004, it was noted that Plaintiff experienced back pain but that she tolerates the pain.  (Tr. 209.)  It was also noted that Plaintiff experienced anxiety and/or depression but Plaintiff was noted to have normal mood and affect.  (Tr. 209-10.)

On March 16, 2004, Plaintiff reported to Cross Trails that she had low back pain.  (Tr. 207.)  During follow up on March 23, 2004, Plaintiff did not report any such pain.  (Tr. 205.)

With her visit to Cross Trails on April 5, 2004, Plaintiff was diagnosed with lumbar back pain and bilateral lower extremity numbness.  (Tr. 204.)  On May 4, 2004, it was noted that Plaintiff's back pain was "not really improving" with physical

---

[3]Lexapro is used to treat depression and generalized anxiety disorder.  Medline Plus (last revised Apr. 1, 2005) <http:// www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html>.

[4]Nexium is used to treat GERD.  Medline Plus (last revised Apr. 1, 2004)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a699054.html>.

therapy.[5]  (Tr. 201.)  Plaintiff was referred to Dr. Guidos, a physiatrist, for evaluation.  (Tr. 202.)

On May 13, 2004, Plaintiff visited Dr. Paul J. Guidos at Southeast Missouri Hospital. (Tr. 199-200.) Plaintiff complained of experiencing back pain for twenty years with radicular symptoms down into her legs.  Plaintiff reported that the symptoms had worsened during the previous two years.  Plaintiff reported that physical therapy provided no significant help.[6]  Plaintiff also reported some ongoing neck pain with radicular symptoms to the right upper extremity.  Plaintiff denied any shortness of breath or chest pain.  Plaintiff's current medications were noted to be Zantac, Lexapro and Mevacor.  Physical examination showed Plaintiff not to be in acute distress.  No signs of mood disorder were observed.  Dr. Guidos noted range of motion of the cervical region on the right side to be somewhat restrained.  Reflexes were noted to be mildly dampened in the right brachial radialis, and normal otherwise.  Marked pain and tenderness was noted in the L5-S1 paraspinous deep extensor muscles with trigger points noted bilaterally.  Marked pain and tenderness in the SI joints were noted bilaterally, indicating some sciatica.  Otherwise, reflex examination of the lower extremities was normal, with normal downgoing toes.  Plaintiff was unable to walk on her tiptoes.  Dr.

_____

[5]No record of any physical therapy referral or treatment appears in the administrative transcript.

[6]See supra note 5.

- 16 -

Guidos ordered various diagnostic tests and determined that Plaintiff would be administered an injection at her next visit. (Tr. 199.)

Plaintiff visited Bootheel Counseling Services on June 11, 2004, and reported that she was experiencing financial strain because of her inability to work due to worsening back pain; and that she was suffering symptoms including depression, anxiety, difficulty falling asleep, mind racing, irritability, crying spells, and forgetfulness. Plaintiff's mental and emotional status were noted to be normal. (Tr. 193.) Plaintiff reported a history of abuse by previous husbands, which was noted by Clinical Therapist Kyle Schott to possibly contribute to her depression. Therapist Schott diagnosed Plaintiff with Depressive Disorder, Not Otherwise Specified; back and feet problems; and acid reflux. A Global Assessment of Functional (GAF) score of 51 was assigned. Therapist Schott recommended that Plaintiff continue in counseling. (Tr. 194).

Plaintiff returned to Dr. Guidos on June 15, 2004, who noted diagnostic tests to show bilateral median nerve apraxia at the flexor retinaculum of the wrist consistent with bilateral carpal tunnel syndrome; and evidence of left L5-S1 radiculopathy. Physical examination of the extremities showed continued marked pain and tenderness with trigger points at the bilateral L5 and S1 region. Evidence of pain and tenderness in the left sacro-iliac

joints was noted, as well as pain and tenderness on range of motion of the left hip and within the left hip joint proper. Plaintiff was administered Depo-Medrol[7] injections to her left hip, left sacro-iliac joint, and L5-S1 trigger point. (Tr. 197.) Injections to the wrist joints were considered for the next visit, and a home exercise program was discussed. (Tr. 198.)

Plaintiff met with Clinical Therapist Deidre Hornburg on June 24, 2004. Mental status examination showed Plaintiff's mood, affect, behavior, and thought content to be appropriate. Plaintiff was noted to have fair insight and good judgment. Therapist Hornburg noted Plaintiff to maintain a positive attitude and to be receptive and cooperative throughout the session. Therapist Hornburg encouraged Plaintiff to follow up on her medical problems inasmuch as Plaintiff admitted to not following up with respect to her foot condition. (Tr. 192.)

On July 6, 2004, Plaintiff requested of Dr. Guidos that she be administered an additional injection for her low back pain. Plaintiff reported that she had excellent relief for approximately two and one-half weeks after her recent injections, but that the pain gradually returned. Dr. Guidos noted, however, that Plaintiff reported increased activity level and he questioned whether such increased activity caused re-exacerbation of the pain. Physical

---

[7]Depo-Medrol is a steroid primarily used for its potent anti-inflammatory effect. Physicians' Desk Reference 2594 (55th ed. 2001).

examination showed marked pain and tenderness in each of the bilateral SI joints and marked pain and tenderness at the L5-S1 region bilaterally with trigger points. Depo-Medrol injections were administered. Plaintiff was instructed to participate in a home exercise program two to three times a week. (Tr. 195.) It was determined that injections to the wrist joints would be administered at the next visit. (Tr. 195-96.)

Plaintiff returned to Therapist Hornburg on July 8, 2004, and reported that things were "about the same." Therapist Hornburg noted Plaintiff to have a positive attitude and Plaintiff articulated that she continued to keep positive. Mental status examination was unchanged from the last session. (Tr. 191.)

Plaintiff visited Dr. Kathleen K. Appleman on July 14, 2004, for evaluation of both feet. Plaintiff reported having problems walking and wearing shoes inasmuch as the hammertoe deformity caused pain. Physical examination and x-rays showed deformity and dislocation of the third digit of the left foot. Surgery to correct the deformity was scheduled. (Tr. 169.)

On July 21, 2004, Plaintiff underwent arthroplasty and pin fixation of the third digit of the left foot to correct hammertoe deformity with dislocation. (Tr. 170-90.) Plaintiff was provided a post-op shoe to use while ambulating and was given Vicodin[8] and Darvocet[9] for pain. (Tr. 171.)

---

[8]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th

Plaintiff visited Dr. Appleman on July 23, 2004, for follow up of her recent surgery. Plaintiff reported doing well until that day when she stepped, felt something pop and then experienced pain within the toe. X-rays showed relocation of the digit with a slight bend in the K-wire. Dr. Appleman opined that such condition was induced by Plaintiff's increased pressure in the area. Plaintiff was instructed to remain non-weight bearing with the use of a walker. Plaintiff was instructed to follow up in ten days for suture and pin removal. (Tr. 168.)

## IV.  The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found Plaintiff's arthritis in her hands, dyspnea, back pain at L5-S1, hammertoes, and depressive disorder to be severe but that they did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found Plaintiff's allegations regarding her limitations not to be totally credible. The ALJ found Plaintiff to have the residual functional capacity to be at the light level of lifting and carrying; that Plaintiff could not be required to walk more than two to three blocks at one time, to stand more than forty-five

---

ed. 2001).

[9]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

minutes at one time, or to sit more than thirty minutes at one time; that Plaintiff required an alternate sit/stand option; and that Plaintiff could not work in temperature extremes of hot or cold. Considering Plaintiff's age, education, work experience, and exertional capacity, the ALJ found Plaintiff able to perform work which exists in significant numbers in the national economy, such as surveillance system monitor, production inspector, order clerk, copy-machine operator, and cashier. The ALJ thus found Plaintiff not to be under a disability at any time through the date of the decision. (Tr. 20.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, Plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to

do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d

1047, 1050 (8th Cir. 1999).  However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's

findings may still be supported by substantial evidence.  <u>Pearsall</u>,

274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th

Cir. 2000)).  A Commissioner's decision may not be reversed merely

because substantial evidence also exists that would support a

contrary outcome.  <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974,

977 (8th Cir. 2003).

        Plaintiff claims that the ALJ's decision is not supported

by substantial evidence on the record as a whole and, specifically,

that the ALJ erred in his credibility determination inasmuch as he

required objective evidence of pain.  Plaintiff also contends that

the ALJ erred when he failed to consider the combination of

Plaintiff's multiple impairments in determining Plaintiff not to be

disabled.

A.    <u>Credibility Determination</u>

        Before determining a claimant's RFC, the ALJ must first

evaluate the claimant's credibility.  <u>Tellez v. Barnhart</u>, 403 F.3d

953, 957 (8th Cir. 2005).  In determining the credibility of a

claimant's subjective complaints, the ALJ must consider all

evidence relating to the complaints, including the claimant's prior

work record and third party observations as to the claimant's daily

activities; the duration, frequency and intensity of the symptoms;

any precipitating and aggravating factors; the dosage,

effectiveness and side effects of medication; and any functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  Although the ALJ may discount subjective complaints of pain if there are inconsistencies in the evidence as a whole, he may not do so solely because the complaints are not fully supported by the objective medical evidence.  Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005); Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Strict reliance on the absence of objective medical evidence is reversible error.  Halpin, 999 F.2d at 346.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible."  Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th

Cir. 2001).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  Tellez, 403 F.3d at 957; Pearsall, 274 F.3d at 1218.

Plaintiff complains here that the ALJ committed reversible error by requiring objective medical evidence to substantiate Plaintiff's subjective complaints of pain.  A review of the ALJ's written decision, however, belies this contention.

In his decision, the ALJ identified the Polaski factors and set out numerous inconsistencies in the record to support his conclusion that Plaintiff's complaints were not credible. Specifically, the ALJ noted that Plaintiff did not seek treatment for her back condition until April 2004 and did not seek treatment for her mental condition until June 2004.  See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) (failure to seek medical treatment for symptoms inconsistent with subjective complaints of pain); see also Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (failure to seek more aggressive treatment and lack of continuous treatment inconsistent with complaints of disabling pain).  The ALJ also noted that Plaintiff had not seen a psychiatrist nor had been hospitalized for her mental impairment.  See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (ALJ's findings of absence of hospitalizations and limited treatment of symptoms supported adverse credibility determination).  The ALJ noted that Plaintiff's first surgery on her hammertoe was successful such that Plaintiff

was able to resume full time work thereafter.  The ALJ observed that Plaintiff recently underwent surgery for a second hammertoe and nothing in the record indicates that Plaintiff would not obtain similar success.  See Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000) (successful treatment of condition relevant in credibility determination).  Finally, the ALJ noted that Plaintiff received two steroid injections for her back condition but that she currently took no medication for the condition, and that Plaintiff took only Advil for her wrist and arthritis pain in her hands.  See Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication is inconsistent with subjective complaints of disabling pain); Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992) (noting use of non-prescription pain medication undercut claimant's complaints of disabling pain); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (ALJ may properly consider the type of medication prescribed to determine the sincerity of the claimant's allegations of pain).  Substantial evidence on the record as a whole supports these findings.

To the extent it may be argued that Plaintiff's failure to consistently seek treatment or obtain stronger pain medication was due to Plaintiff's inability to afford them, there is no evidence that Plaintiff was ever denied medical treatment due to financial reasons.  Without such evidence, Plaintiff's failure to take pain medication is relevant to the credibility determination.

_Goff_, 421 F.3d at 793 (citing _Clark v. Shalala_, 28 F.3d 828, 831 n.4 (8th Cir. 1994)). Further, while the ALJ did not methodically discuss in detail each of the _Polaski_ factors, he acknowledged and examined those factors before determinating that Plaintiff's testimony of disabling symptoms was not fully credible. Because such determination is supported by the record as a whole, it should not be disturbed by this Court. See _Lowe v. Apfel_, 226 F.3d 969, 972 (8th Cir. 2000); _Reynolds v. Chater_, 82 F.3d 254, 258 (8th Cir. 1996); _see also_ _Robinson v. Sullivan_, 956 F.2d 836, 841 (8th Cir. 1992) (administrative finding not required to be set aside when deficiency in opinion-writing technique has no bearing on outcome).

A review of the ALJ's decision shows that upon identifying the _Polaski_ factors required to be considered in determining the credibility of a claimant's subjective complaints, the ALJ expressly considered Plaintiff's testimony and identified in his written decision evidence contained in the record as a whole which was inconsistent with Plaintiff's claims that she was unable to engage in work activity. While the ALJ considered the objective medical evidence as a factor in his determination, such consideration was permissible here inasmuch as the ALJ also considered many other inconsistencies in the record in determining Plaintiff's subjective complaints not to be fully credible. See _Gonzales v. Barnhart_, 465 F.3d 890, 895 (8th Cir. 2006); _Ramirez v. Barnhart_, 292 F.3d 576, 581 (8th Cir. 2002). Plaintiff's claim

that the ALJ based his credibility determination solely on the lack of objective medical evidence is without merit.

B. <u>Combination of Impairments</u>

Plaintiff complains that the ALJ erred by failing to assess the combination of Plaintiff's impairments. A review of the ALJ's decision shows Plaintiff's claim to be unfounded.

In his written decision, the ALJ thoroughly summarized the evidence of record relating to each of Plaintiff's alleged impairments. (Tr. 15-17.) Upon conclusion of this extensive summary, the ALJ articulated that he must determine whether Plaintiff had a severe impairment or combination of impairments, noting specifically,

> A severe combination of impairments is one that causes more than a slight abnormality that causes more than a minimal effect on his [sic] ability to work. In this case, the medical records indicate the claimant has arthritis in her hands, dyspnea, back pain at L5-S1, hammer toes, and a depressive disorder. *This combination of impairments is severe.*

(Tr. 17.) (Emphasis added.)

Thereafter, the ALJ considered Plaintiff's impairments in combination in determining Plaintiff's RFC, including Plaintiff's credibility. In addition, the undersigned notes that the ALJ's hypothetical question posed to the vocational expert, upon whose testimony the ALJ relied in his determination, included a description of the limitations caused by all of Plaintiff's

impairments the ALJ found to be credible and supported by the evidence on the record as a whole.  Inasmuch as the question posed to the vocational expert considered Plaintiff's impairments in combination, Plaintiff's claim that the ALJ failed to consider the combined effect of her impairments is without merit.  E.g., Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000) (hypothetical question must set out claimant's impairments adequately capturing concrete consequences arising therefrom).

In light of the ALJ's extensive discussion of Plaintiff's multiple impairments, his specific finding that the combination of these impairments was severe, and his reliance on vocational expert testimony given upon consideration of Plaintiff's impairments *in toto*, Plaintiff's cursory claim that the ALJ failed to consider the combination of her impairments is without merit and should be denied.  Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994); see also Barnes v. Social Sec. Admin., 171 F.3d 1181, 1183 (8th Cir. 1999).

## VI.  Conclusion

For the reasons set out above on the claims raised by Plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and Plaintiff's claims of error should be denied.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the

case differently.  <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).  Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that Plaintiff is not disabled should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **December 26, 2006.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this _13th_ day of December, 2006.